## UNION BANK *v.* BLANCHARD.

In an action to recover the price of goods sold, if the defendant pleads, by way of recoupment, damages suffered by him from a breach by the plaintiff of his contract as to the quality of the goods, he can have judgment only for costs, though his damages exceed the amount of the plaintiff's claim.

ASSUMPSIT, upon two drafts drawn by the Eldred Milling Company, the plaintiffs in interest, upon and accepted by the defendant, who declined to pay them at maturity. The drafts were made each for the price of a carload of "Eldred's Straight" flour, sold by the plaintiffs to the defendant through their agents, W. S. King & Co. The defendant claimed that the flour delivered was of an inferior grade to that bargained for, and claimed to recoup the damages suffered by him through this breach of the contract. As bearing upon this question, the defendant, who had previously purchased of King the plaintiffs' flour, and also flour manufactured by one Hayden, for whom King was also agent, was permitted, against the plaintiffs' exception, to testify that the difference in price between Hayden's second patent and Hayden's first patent was uniformly from forty to fifty cents a barrel, and the difference in price between "Eldred's Straight" and Eldred's first patent was always the same. When the bargain in question was made, Eldred's price for the first patent was sixty cents more per barrel than for "Eldred's Straight."

While King was agent for both Hayden and the Eldred Co., in the summer and fall of 1885, he sent the defendant by mail frequent written statements of the prices of Hayden's and Eldred's flour of different grades, and, subject to the plaintiffs' exception, these statements were put in evidence by the defendant, as tending to show King's use of the words "Straight," "Best," "Fancy Straight," "Eldred," &c., to designate the next grade of Eldred flour below his first patent; that that grade was substantially the same as Hayden's second patent, and that King guaranteed this grade as good as Hayden's second patent.

The defendant read in evidence the deposition of Edward P. Leavitt, one of the firm of Dickerman, Leavitt & Co., wholesale dealers in flour and grain. He testified, that before becoming a member of that firm he had been an agent for the sale of flour for many years, and as such agent had sold for his principals Hayden's and Eldred's flour in 1885, and that there was no substantial difference between the grades of Hayden's second patent and "Eldred's Straight," and that he knew of no grade of Eldred's between his first patent and "Straight." He also stated that his firm bought of Eldred & Co., through King as agent, 1,000 barrels of "Eldred's Straight," which included the three carloads shipped to the defend-

ant as a part of his 1,000 barrels, but not received by him. They sold a large part of this flour to different parties in New Hampshire, and were compelled in settlement to make a discount of fifty cents a barrel, because it did not give satisfaction. One carload was resold, at a discount of thirty cents a barrel. They have 200 barrels of it on hand. King warranted the flour to be as good as the Eldred Co. had ever made, and that it would give perfect satisfaction. It was not up to the standard of that grade.

To the inquiries and answers in the deposition making a comparison between Hayden's second patent and "Eldred's Straight," and to those relating to the deponent's making a loss or discount in the sale of the flour, and to the flour's being of an inferior grade, the plaintiffs objected, and they were read and considered subject to exception.

*Bingham & Mitchell*, for the plaintiffs.

*Chase & Streeter*, for the defendant.

SMITH, J.  1. The two drafts which are the subject of this suit, amounting in the aggregate to $891.50, were given for 250 barrels of flour, part of a lot of 1,000 barrels of a brand known as "Eldred's Straight," which the plaintiffs in interest, the Eldred Milling Co., agreed to sell, and the defendant, doing business under the name of Blanchard & Co., agreed to buy at $4.15 per barrel, to be delivered at Concord or such place in the vicinity as the defendant might direct. The drafts were accepted by the defendant, but payment was refused at maturity upon the ground that the flour, which did not arrive until after acceptance, was of inferior quality. The defendant afterwards paid the plaintiffs $607.28. The plaintiffs seek to recover the balance, $284.22, and the defendant claims that after recouping his damages there is nothing due. The fact that the flour was of inferior quality was established at the trial, and the damages in that respect assessed at $37.50. Damages were also assessed at $322.50, the additional sum the defendant was compelled to pay to purchase 1,000 barrels of flour of the quality contracted for, to supply his customers, the price having risen in the market after the contract was closed: also, at the sum of $13.50 for freight on two carloads of flour supplied by the defendant to his customers who were dissatisfied with flour which he had sent them from the 250 barrels forwarded by the plaintiffs. The aggregate of these three sums is $373.50, or $89.28 more than the balance claimed to be due upon the drafts, and the defendant claims judgment for that sum.

This contention cannot be sustained. The defendant, by tendering the plaintiffs $607.28 (treated as if paid into court), admitted that that sum was due, and the only question tried or that could be tried under the pleadings was, not whether so much was due, but

whether anything more was due.    Under the pleadings there can
be no judgment for the defendant except for costs.    Recoupment is
allowed to prevent circuity of action.    In *Railroad Co.* v. *Smith*, 21
Wall. 255, 261; it was held that a party is not required to pay for
imperfect and defective work the price stipulated for a perfect
structure, but may recoup his direct damages, not exceeding the
demand of the plaintiff.    In this state it is settled that when a
party is sued upon a contract which has been broken, if he elects
to have his damages considered in the action against him, "he must
be understood as conceding that they are not to be extended beyond
the amount of what he has received, and he cannot afterwards sus-
tain an action for further damages."    *Britton* v. *Turner*, 6 N. H.
481, 495 ; *Horn* v. *Batchelder*, 41 N. H. 86.

There is no question of rescission in this case.    The fact has not
been found.    The telegrams and correspondence (made a part of
the case) do not show a rescission.    On the contrary, they show not
only a willingness but a desire by the defendant that the plaintiffs
fulfil the contract, and repeated requests to them to forward flour
of the quality bargained for.    December 18, after considerable
telegraphing and correspondence, he telegraphed the plaintiffs as
follows : "Shall not pay the accepted drafts till we get the flour
we bought.    Consider the flour you have shipped yours."    The
plaintiffs thereupon refused to send any more flour of any quality.

December 31, when King, their agent, wrote to the defendant
demanding the two carloads of flour or payment of the acceptances,
he did not deliver it, having sold some of it and transported the
remainder to his store-house.    It is contended by the plaintiffs that
the defendant could not retain the flour without paying the con-
tract price for the same, because he had notified them of his refusal
to receive it after having discovered from examination and trial its
actual quality ; and hence that the sum of $37.50 must be eliminat-
ed from the damages assessed.    If there can be said to be any ques-
tion as to the defendant's right to recoup this sum, or the sum of
$13.50, it is unnecessary to consider it, for the sum of $322.50 is
more than the balance due upon the drafts.    The sum last named,
being the damages sustained by the defendant for the plaintiffs'
breach of contract, may be recouped.    *Horn* v. *Batchelder*, 41 N. H.
86 ; *Flanders* v. *Putney*, 58 N. H. 358; *Cole* v. *Colburn*, 61 N. H.
499.    As a general rule, the measure of the vendee's damages is the
difference between the value of the goods as they would have been
if the warranty as to quality had been true, and the actual value
at the time of the sale, including gains prevented and losses sus-
tained, and such other damages as could be reasonably anticipated
by the parties as likely to be caused by the vendor's failure to keep
his agreement, and could not by reasonable care on the part of the
vendee have been avoided.    *Noyes* v. *Blodgett*, 58 N. H. 502 ;
*Hurd* v. *Dunsmore*, 63 N. H. 171; *Griffin* v. *Colver*, 16 N. Y. 489.
In this case the damages have been assessed at $373.50.    As the

sum of $322.50, one of the sums that make up the aggregate of $373.50, is larger than the sum due upon the two drafts, the defendant is entitled to judgment for his costs.

2. The testimony of Blanchard, excepted to, was admitted for the purpose of showing that the grade of flour which he bargained for was equivalent to "Hayden's second patent," and of the highest grade of Eldred next to his first patent. Evidence that "Eldred's Straight" sold for sixty cents per barrel less than "Eldred's first patent," while "Hayden's second patent" sold for forty to fifty cents less than the grade known as his "first patent," might tend to show that the flour sold to the defendant as "Eldred's Straight" was inferior in quality to "Hayden's second patent," if there was no difference in quality between Eldred's and Hayden's first patents. If the evidence did not tend to show this, it was merely immaterial, and its admission was not prejudicial to the plaintiffs' case.

3. The letters and written statements of King, sent to the defendant during the course of the negotiations for the sale of the flour, were competent for the purpose for which they were admitted. It was within the apparent scope of the authority conferred upon King to make representations as to the grade or quality of the flour he was commissioned to sell; and it was competent to show that the different brands named in his letters were represented by him to be one and the same grade of flour and equal to "Hayden's second patent," as bearing on the quality of the flour sold.

4. Whether Leavitt was qualified by his experience in dealing in flour manufactured by Eldred and by Hayden to testify as to the comparative quality of their several grades was a question of fact, to be determined at the trial. His testimony that there was no substantial difference between "Eldred's Straight" and "Hayden's second patent," and that there was no grade between "Eldred's first patent" and "Eldred's Straight," was competent upon the question what grade of flour known as "Eldred's Straight" or "Eldred's Best" was intended in the contract between the parties, and as tending to show that the quality intended was that next below "Eldred's first patent." So his testimony as to the loss made by him on 1,000 barrels of flour bought of the plaintiffs as "Eldred's Straight," and which included 375 barrels of the 1,000 bargained to the defendant, was competent as tending to prove the inferior quality of the flour sent to the defendant, as well as on the question of damages.

*Exceptions overruled.*

ALLEN, J., did not sit: the others concurred.